No. 21-4235

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

STATE OF OHIO, et al.,
*Plaintiffs-Appellants*,

v.

XAVIER BECCERA, et al.,
*Defendants-Appellees*,

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:21-cv-675-TSB

**BRIEF OF MONTANA, ALASKA, GEORGIA, IDAHO, INDIANA, LOUISIANA, MISSISSIPPI, SOUTH DAKOTA, AND TEXAS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS'**

AUSTIN KNUDSEN
Montana Attorney General
KRISTIN HANSEN
*Lieutenant General*
DAVID M.S. DEWHIRST
*Solicitor General*
david.dewhirst@mt.gov

CHRISTIAN B. CORRIGAN*
*Assistant Solicitor General*
*Counsel of Record*
215 North Sanders
P.O. BOX 201401
Helena, MT 59620-1401
406-444-2026
christian.corrigan@mt.gov

*Counsel for State of Montana*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES .................................................... iii

INTEREST OF AMICI ................................................................ 1

INTRODUCTION ........................................................................ 1

    I.  The Final Rule violates Title X by funding and encouraging abortions. ........................................................................... 3

    II.  The Final Rule is arbitrary and capricious. ....................... 11

        A.  Federal Conscience Statutes ........................................ 12

        B.  The Final Rule ignores important aspects of the problem. .......... 15

CONCLUSION ........................................................................... 24

CERTIFICATE OF COMPLIANCE ....................................... 26

CERTIFICATE OF SERVICE................................................. 26

## TABLE OF AUTHORITIES

### CASES

*Armatas v. Pulmonary Physicians, Inc.*,
No. 21-3926, 2021 U.S. App. LEXIS 35836
(6th Cir. Dec. 3, 2021) ................................................................ 1

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .............................................................. 21

*Cleveland Cliffs Iron Co. v. ICC*,
664 F.2d 568 (6th Cir. 1981) ................................................ 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ......................................................... 12

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2021) ................................................ 23

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) ................................................................ 6

*Little Sisters of the Poor Santis Peter & Paul Home v. Pennsylvania*,
140 S. Ct. 2367 ..................................................................... 20

*Maher v. Roe*,
432 U.S. 464 (1977) ................................................................ 5

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................... 11, 15, 20, 23

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 ................................................................... 17, 19

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................... 1, 10, 24

*Planned Parenthood Fed'n v. Sullivan*,
913 F.2d 1492 (10th Cir. 1990) ............................................. 4

*Radio Ass'n on Defending Airwave Rights v. United States DOT*,
    47 F.3d 794 (6th Cir. 1995) ..................................................... 3, 16, 19

*Roberts v. Neace*,
    958 F.3d 409 (6th Cir. 2020) ............................................................. 1

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ...................................................................... 3, 5, 7

*United States v. Akzo Coatings of Am.*,
    949 F.2d 1409 (6th Cir. 1991) ........................................................ 11

*Vita Nuova, Inc. v. Azar*,
    458 F. Supp. 3d 546 (N.D. Tex. 2020) ........................................... 8, 23

*Zubik v. Burwell*,
    136 S. Ct. 1557 (2016) ................................................................ 21, 22

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A) ......................................................................... 10
42 U.S.C. § 238n(a) .......................................................................... 13
42 U.S.C. 300a-7(c)(1). ..................................................................... 14
42 U.S.C. 300a-7(c)(2) ...................................................................... 14
42 U.S.C. § 300(a) ........................................................................ 4, 5
42 U.S.C. § 300a-6 ........................................................................... 2
42 U.S.C. § 300a-7(b) .................................................................. 14, 15
42 U.S.C. § 300a-7(d) ....................................................................... 14
42 U.S.C. § 300a-7(c) ....................................................................... 13

## REGULATIONS

65 Fed. Reg. 41281 (July 3, 2000) ...................................................... 7
83 Fed. Reg. 25502 (June 1, 2018) .................................................... 23
84 Fed. Reg. 77149 (March 4, 2019) ........................................ *Passim*
86 Fed. Reg. 56144-01 (Oct. 7, 2021) ....................................... *Passim*

## OTHER AUTHORITIES

H.R. Conf. Rep. No 91-1667 (1970) ...................................................... 4

H.R. Conf. Rep. No. 572 (1970) ........................................................... 9

116 Cong. Rec. 37375 (Nov. 16. 1970)........................................... 5, 9

Title X Opinion, 11 Op. O.L.C. 77 ........................................... 6, 8, 10

*Scheppers, E. et al., Potential Barriers to the Use of Health Services
Among Ethnic Minorities: A Review, Family Practice
(23): 325, 343 (June 1, 2006)* ........................................................ 17

## INTEREST OF AMICI

Amici Curiae States of Montana, Alaska, Georgia, Idaho, Indiana, Louisiana, Mississippi, South Dakota, and Texas, ("the States") seek to enforce the strict statutory requirements of § 1008 and prevent the irreparable injuries from Title X funds being utilized to subsidize abortion. The States also seek to protect the conscience rights of providers who decline to provide, perform, participate in, or refer for, abortions. The States are represented by their respective Attorneys General, who bear the duty and authority to represent the States in court. The States have providers within their borders who receive Title X funds and will be affected by the Final Rule's plain violation of Congress's express wishes.

## INTRODUCTION

Plaintiffs-Appellants Ohio, et al. ("Plaintiffs") have demonstrated convincingly that the circumstances justify this Court granting an injunction pending appeal. *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). Plaintiffs, most importantly, have made a strong showing that they are likely to succeed on the merits and will suffer irreparable injury absent a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Armatas*, 2021 U.S. App. LEXIS 35836, at *2 (2021) ("more than a mere 'possibility'

of relief and of irreparable injury is necessary to satisfy these factors"). The Final Rule, *Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56144-01 (Oct. 7, 2021) (to be codified at 42 C.F.R. pt. 59) ("Final Rule"), promulgated by the Department of Health and Human Service ("HHS" or "Agency") illegally allows funds appropriated under Title X of the Public Health Service Act (PHSA) to be used in programs where abortion is a method of family planning.  That squarely violates 42 U.S.C. § 300a-6.

Section 1008 of Title X of the PHSA, codified at 42 U.S.C. § 300a-6, expressly prohibits Title X funds from being "used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  The text, history, and purpose of § 1008 demonstrate that the Agency's prior policy correctly enforced the statute by (1) requiring Title X projects to "be organized so that [they are] physically and financially separate" and (2) prohibiting grantees from making referrals for elective abortions.  *See Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg., 7714, 7789 (March 4, 2019) ("2019 Rule").  The Final Rule—which eliminates the 2019 Rule's mandatory financial-and physical-separation

requirements and requires that Title X grantees make abortion referrals upon request—plainly violates § 1008.

The Final Rule is also arbitrary and capricious in violation of the Administrative Procedure Act (APA) because it failed to consider numerous statutory provisions protecting those who have moral and religious objections to abortion. *Radio Ass'n on Defending Airwave Rights v. United States DOT*, 47 F.3d 794, 802 (6th Cir. 1995). The Agency, moreover, failed to consider providing an express exemption process and the consequences of not doing so. This was despite the fact that HHS was aware of the chilling effect that the lack of an express exemption would have on providers and patients.

Finally, as detailed in Plaintiffs' Motion for Injunction Pending Appeal, the States will likewise suffer irreparable injury without an injunction. *See* Doc. 13 at 21–23.

For these reasons, the Court should grant Plaintiffs' request for an injunction.

## I. The Final Rule violates Title X by funding and encouraging abortions.

Title X "provides federal funding for family-planning services." *Rust v. Sullivan*, 500 U.S. 173, 178 (1991). It "authorizes the Secretary

[of Health and Human Services] to 'make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." *Id.* (quoting 42 U.S.C. § 300(a)). Among the acceptable methods of family planning listed by § 300(a) are natural family planning methods, infertility services, and services for adolescents. Faith-based providers are more likely to offer natural family planning services.

In § 1008, however, "Congress forbade the use of appropriated funds in programs where abortion is a method of family planning." *Id.* at 191 (1991). Congress added this language "to make [its] intent clear" that Title X "be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities." H.R. Conf. Rep. No. 91-1667, at 8 (1970).

As with most statutes, Title X provides HHS with some discretion in administering its family planning programs. But this discretion comes with a red line: Title X may not be used to fund abortions—directly or indirectly. *See Planned Parenthood Fed'n v. Sullivan*, 913 F.2d 1492,

1497 (10th Cir. 1990) ("Title X clearly directs the Secretary to administer a grant program to promote family planning under a statute that delegates to him some discretion with an admonition not to fund abortions."). Title X notably funds "a broad range of *acceptable* and effective family planning methods and services." 42 U.S.C. § 300(a) (emphasis added). The language of § 1008 makes clear, however, that abortion is *not* an acceptable method or service. Full stop.

Section 1008 reflects Congress's "value judgment favoring childbirth over abortion, and … implement[s] that judgment by the allocation of public funds." *Maher v. Roe*, 432 U.S. 464, 474 (1977). As such, Congress made the decision to "subsidize family planning services which will lead to conception and childbirth, and declining to promote or encourage abortion." *Rust*, 500 U.S. at 192–93 (quotations omitted). If more evidence beyond the plain text were necessary, contemporaneous evidence confirms the plain reading of § 1008 by showing that Congress understood that Title X funds were not to be used—directly or indirectly—to fund, aid, support, or encourage abortion. *See, e.g.*, 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell) ("With the 'prohibition of abortion' amendment—title X, section 1008—the committee members clearly

intend *that abortion is not to be encouraged or promoted in any way through this legislatio*n.") (emphasis added).  HHS's 1988 regulations, as well as its 2019 Rule, were thus "designed to ensure that the limits of the [Title X] program are observed." *See id.* at 193.

The 2019 Rule's strict financial and physical separation requirements, *see* 84 Fed. Reg. at 7789 (providing a list of criteria for the Secretary to determine if a Title X project was physically and financially separate from abortion), were not just permissible for the Agency to enact, they are required by the statute.[1] Those requirements are necessary because, as the HHS recognizes, Section 1008 "prohibit[s]" the agency from "subsidiz[ing] abortion." 86 Fed. Reg. at 56150.  Without them, the prohibitory language in § 1008 would be borderline meaningless.  Any comingling of funds, staff, or other resources, of any degree, or achievement of economies of scale, violates § 1008.  *See, e.g.,* 84 Fed. Reg. at 7766

---

[1] In the wake of the Supreme Court's decision in *Grove City Coll. v. Bell*, 465 U.S. 555 (1984), a 1987 OLC opinion was ambivalent regarding the exact degrees of separation required by § 1008.  It did, however note: "[A] reasonable amount of functional separation may not only be possible, but required. For instance, it may be reasonable in some cases to require that the abortion counseling be provided in a different office than the family planning counseling. This separation would become increasingly important if it was the only reasonable means to segregate abortion-related materials or personnel from the family planning context."  Title X Opinion, 11 Op. O.L.C. 77 at 87.

(commenters opposing strict separation requirements because they preclude abortion providers from achieving economies of scale).

Yet the Final Rule does more than simply remove the strict separation requirements set forth in the 2019 Rule. It actually *endorses* the use of Title X funds to subsidize abortion by allowing Title X grantees to have an "abortion element in a program of family planning services," so long as it is not too "large" or "intimately related" to the Title X program. *See* 86 Fed. Reg. at 56150; 86 Fed. Reg. at 56150; *Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41281, 41282 (July 3, 2000). This plainly defiles the moral clarity Congress codified in Title X.

It would perhaps be one thing if the Agency simply jettisoned the strict separation requirements of the 2019 Rule and simply told grantees that funds could not be used in violation of Title X. Although Amici believe HHS is required to adopt strict regulations to properly administer and enforce § 1008, the Agency's silence could at least arguably be viewed as not inconsistent with § 1008. *See Rust*, 500 U.S. at 184. But that's not the case.

Here, the Agency openly violated Congress's wishes and express commands.  Looking at its plain text, the Final Rule plainly allows Title X recipients to share "staff," "waiting room[s]," and treatment rooms with abortion facilities.  86 Fed. Reg. at 56150.  The 2019 Rule correctly recognized that integrating services in this manner lowers the cost of business for abortion providers.  84 Fed. Reg. at 7766 ("If the collocation of a Title X clinic with an abortion clinic permits the abortion clinic to achieve economies of scale, the Title X project (and, thus, Title X funds) would be supporting abortion as a method of family planning.  Put differently, the abortion clinic would be benefiting from the presence of the Title X project in the same location.").

The Final Rule also illegally requires that that Title X grantees make abortion referrals "upon request."  86 Fed. Reg. at 56179.  As a 1987 OLC opinion concluded, "§ 1008 compels the Secretary of [HHS] to prohibit in Title X programs all counseling and referrals related to abortion as a method of family planning, although abortion counseling and referrals should not be prohibited where they are medically indicated."  Title X Opinion, 11 Op. O.L.C. 77 at 78.  The 2019 Rule correctly prohibited Title X grantees from making referrals for elective abortions to avoid

promoting or encouraging abortion and to comply with section 1008's prohibition on funding programs where abortion is a method of family planning. 84 Fed. Reg. at 7788–89. It specified that Title X projects could not provide pregnant patients certain information through nondirective counseling. It protected § 1008's threshold requirements by mandating that this nondirective counseling could only provide neutral information. *See also* Title X Opinion, 11 Op. OLC at 79 ("The view that the plain meaning of § 1008 prohibits abortion counseling and referral is supported by its legislative history.") (citing 116 Cong. Rec. 37375 (1970) (floor statement of Rep. Dingell); H.R. Conf. Rep. No. 572, 91st Cong., 1st Sess. 2 (1970) (Conference Report)). Without these requirements, providers would be allowed to encourage or promote abortion upon request even under the guise of nondirective counseling on abortion—putting them out of compliance with the statute. 84 Fed. Reg. at 7716; *id.* at 7788–89. Federal conscience laws and § 1008 can tolerate no less.

Requiring Title X grantees to make abortion referrals upon request is tantamount—according to HHS—to funding a program where abortion is the method of family planning. *See* 84 Fed. Reg. at 7717 ("[HHS] believes both the referral for abortion as a method of family planning, and

such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning, contrary to the prohibition against the use of Title X funds in such programs."); *see also* 11 Op. O.L.C. at 79 ("[A] program that includes abortion among the family planning options about which it counsels women is one in which abortion is a method of family planning."). Practically, this allows Title X recipients to refer patients for elective abortions at their own abortion facilities. As aptly demonstrated by Plaintiffs, the logic supporting that conclusion is critically flawed. *See, e.g.*, Doc. 13 at 13. ("Is a dental practice that refers patients to its own doctors for root canals a practice where root canals are a method of dental care?").

The Final Rule is not a permissible construction of § 1008 because it subsidizes abortion by allowing Title X grantees to have an abortion element in their family planning services and requires Title X grantees to make abortion referrals upon request. Plaintiffs have thus carried their burden to show the Final Rule is contrary to law. *See Nken v. Holder*, 556 U.S. at 434.

## II. The Final Rule is arbitrary and capricious.

The Plaintiffs are also likely to succeed on the merits because the Final Rule is arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). The Final Rule is arbitrary and capricious because HHS failed to consider an important aspect of the problem and failed to consider reasonable alternatives. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 51 (1983); *United States v. Akzo Coatings of Am.*, 949 F.2d 1409, 1428 (6th Cir. 1991) (agency must "examine all relevant factors [and] adequately explain its decision").

The Final Rule fails to adequately consider and protect the conscience rights of individuals and entities who decline to provide, perform, participate in, or refer for, abortions. Specifically, the Final Rule's requirement to counsel on abortion, if requested, conflicts with HHS-enforced statutes protecting conscience in health care, including the Church Amendments, 42 U.S.C. § 300a-7, the Coats-Snowe Amendment, section 245 of the Public Health Service Act, 42 U.S.C. § 238n, and the Weldon Amendment, *see, e.g.,* Consolidated Appropriations Act, 2021, Public Law 116-260, Div. H, § 507(d), 134 Stat.1182, 1622 (Dec. 29, 2020); Extending Government Funding and Delivering Emergency Assistance

Act, Public Law 117-43, Div. A, § 101, 135 Stat. 344, 344-45 (Sept. 30, 2021) (appropriating funds through Dec. 3, 2021, and other PHA provisions. There's simply no express exemption for conscience objectors, and this will deter some providers from applying for Title X funds or from seeking to participate in a Title X project as a subrecipient. Patients will pay the subsequent price of more limited options in some locales. Considering such policy implications "was the agency's job, but the agency failed to do it." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020).

## A. Federal Conscience Statutes

The Final Rule fails to adequately account for the protections provided by a plethora of federal conscience statutes. The Church Amendments, which apply to grants funded under the PHSA (such as Title X), prohibit grantees from discriminating against any physician or other health care personnel because he or she refused to perform or assist in the performance of an abortion on the basis of religious belief or moral conviction. 42 U.S.C. § 300a–7(c). The Church Amendments also prohibit individuals from being required to perform or assist in the performance of any part of a health service program or research activity funded

in whole or in part under a program administered by the Secretary contrary to their religious beliefs or moral convictions. *See* 42 U.S.C. § 300a–7(d).

The Coats-Snowe Amendment prohibits the Federal government and any State or local government that receives Federal financial assistance from discriminating against any health care entity (including individual providers) on the basis that the entity refuses to, among other things, (1) receive training in induced abortion; (2) require or provide abortion training; (3) perform abortions; (4) provide referral for such abortions or abortion training; or (5) make arrangements for any such activities. *See* 42 U.S.C. § 238n(a).

The Weldon Amendment—which was added to the annual 2005 health spending bill and has been included in subsequent appropriations bills, *see, e.g.,* Consolidated Appropriations Act, 2021, Public Law 116-260, Div. H, § 507(d), 134 Stat.1182, 1622 (Dec. 29, 2020)—bars the use of appropriated funds on a federal agency or programs, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the

basis that the health care entity does not, among other things, refer for abortions.

Additionally, the Final Rule fails to properly account for several other conscience provisions in the PHSA.  For example, § 300a-7(c)(1) provides that "[n]o entity which receives a grant, contract, loan, or loan guarantee under the [Act]" … may discriminate against any physician or other health care personnel … because he or she refused to perform or assist in the performance of an abortion on the grounds that doing so "would be contrary to his religious beliefs or moral convictions …."  42 U.S.C. 300a-7(c)(1).  Section 300a-7(c)(2) provides that no entity may discriminate against any health care professional "because he refused to perform or assist in the performance of" "any lawful health service" based on religious belief or moral conviction.  42 U.S.C. 300a-7(c)(2).  Section 300a-7(d) provides that "[n]o individual [may] be required to perform or assist in the performance of any part of a health service program … funded in whole or in part under a program administered by the Secretary of Health and Human Services" if doing so "would be contrary to his religious beliefs or moral convictions."  42 U.S.C. § 300a-7(d).  Finally, § 300a-7(b) provides::

[t]he receipt of any grant, contract, loan, or loan guarantee under the [PHSA] … by any individual or entity does not authorize any court or any public official or other public authority to require (1) the individual to perform or assist in an abortion if it would be contrary to his/her religious beliefs or moral convictions; or (2) the entity to make its facilities available for abortions, if the performance of abortions in the facilities is prohibited by the entity on the basis of religious beliefs or moral convictions, or provide personnel for the performance of abortions if it would be contrary to the religious beliefs or moral convictions of such personnel

42 U.S.C. § 300a-7(b).

These conscience statutes are important and well-settled measures that the Final Rule failed to consider.

## B. The Final Rule ignores important aspects of the problem.

The Final Rule, at best, pays lip service to the aforementioned conscience rights protected by federal statute. After receiving "thousands of comments on the preamble language concerning the application of the conscience statutes to Title X," 86 Fed. Reg. at 56152, the text of the Rule incredibly confines conscience rights to a mere footnote. The Final Rule states that "[e]ach project … must [n]ot provide abortion as a method of family planning." 86 Fed. Reg. at 56178. In a footnote to that provision, it then makes the Rule's sole statement regarding conscience rights:

"Providers may separately be covered by federal statutes protecting conscience and/or civil rights." *Id.* at n.2.  That doesn't cut it.

Nor did HHS give "a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn'n,* 463 U.S. at 43.  The Preamble to the Final Rule acknowledges the *existence* of several conscience statutes and the public's concerns about the rights of objectors.  *See* 86 Fed. Reg. at 56153.  It even recognizes that "objecting providers or Title X grantees are not required to counsel or refer for abortions." *Id.*  But it ultimately avoided the issue by falling back on existing structures: "Providers may avail themselves of existing conscience protections and file complaints with OCR, which will be evaluated on a case-by-case basis as is done with other complaints." *Id.*  Its lone assurance to objectors was: "As with any issue facing Title X grantees and applicants, the program will work to provide guidance to grantees and coordinate any conflicts with the OCR.  A case-by-case approach to investigations will best enable the Department to deal with any perceived conflicts within fact-specific situations." *Id.* at 56153–56154.

The Final Rule consequently fails to consider its real and foreseeable burdens on religious exercise and provides no express conscience

exemption. *See Radio Ass'n*, 47 F.3d at 802 ("court must ensure that the agency took a 'hard look' at all relevant issues and considered reasonable alternatives …. "). It inhibits some organizations from applying for Title X funds, or participating in Title X projects, due to the requirement for abortion referrals and information. HHS failed to recognize the 2019 Rule's rationale that, because positions of conscience are often grounded in religious convictions, "[d]enying the aspect of spirituality and religion for some patients can act as a barrier." 84 Fed. Reg. at 7783. "These influences can greatly affect the well-being of people." *Id.* HHS even ignored evidence from the 2019 Rule that "[t]hese influences were reported to be an essential element in the lives of certain migrant women which enabled them to face life with a sense of equality." *Id.* (citing Scheppers, E. et al., *Potential Barriers to the Use of Health Services Among Ethnic Minorities: A Review*, Family Practice (23): 325, 343 (June 1, 2006), https://academic.oup.com/fampra/article/23/3/325/475515).

HHS was—and should have been—well aware of the possibility and probability of conscience objections under the Final Rule. *See* 86 F.R. at 56153. The Final Rule claims that "[f]rom 1993 to 2017, Title X received no reports of grantees or individuals objecting to the regulatory

requirement to counsel or refer for abortions when requested." 86 F.R. at 56153 (citing *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 830).

But as many across America would acknowledge, history did not end (or begin) in 2017. During HHS's 2019 rulemaking process, a number of organizations and grantees made these concerns known to the Agency. *See* 84 Fed. Reg. at 7744. ("Other supportive commenters note that the 2000 regulations stand in the way of some organizations applying for Title X funds, or participating in Title X projects, due to the requirement for abortion referrals and information."). And when mulling regulatory alternatives, HHS considered granting case-by-case exemptions, but rejected the approach noting it would involve a burdensome process and "the mere existence of the requirements—even with a process to apply for exemptions—may serve to discourage organizations with religious or moral objections to counseling on, or referring for, abortion from applying." 84 Fed. Reg. at 7784. Indeed, one Christian, pro-life organization that wished to participate in the Title X program even filed a lawsuit to ensure that a conscience exemption would be recognized if the 2019 Rule was rescinded by a future Administration. *See Vita Nuova,*

*Inc. v. Azar*, 458 F. Supp. 3d 546, 550–51 (N.D. Tex. 2020).  HHS either willfully ignored this history or deliberately chose to ignore it during the rulemaking process.

At no point does the Final Rule consider that it will limit choice for patients, especially those who live in rural or remote areas, where faith-based and local community organizations would be more likely to apply (or seek to participate as a subrecipient) if the abortion counseling and referral requirement were lifted.  Indeed, the Agency during the 2019 rulemaking received comments that the 2000 regulations (which, just like the Final Rule, specified that Title X projects must provide information on, counseling regarding, and referral for, a variety of services for pregnant women, including abortion) did exactly that.  84 Fed. Reg. at 7744.

HHS even acknowledges that it declined to create a specific exemption in 2000, because it was "unaware of any current grantees that object to the requirement for nondirective options counseling, so this suggestion appears to be based on more of a hypothetical than an actual concern." 86 Fed. Reg. at 56153 (quoting *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 830 (2006)).  This mismatch between the

HHS's rationale and the record is itself arbitrary and capricious. *See Radio Ass'n on Defending Airwave Rights*, 47 F.3d at 802 ("rule is arbitrary and capricious if an agency … 'offered an explanation for its decision that runs counter to the evidence before the agency ….'").

Commenters also warned the Agency during the 2021 rulemaking process of "a concern that applications from providers objecting to abortion counseling or referral would not be favorably evaluated." 86 Fed. Reg. at 56153. Yet the Department cast those concerns aside without adequate consideration or explanation.

Rather than giving meaningful consideration to these concerns, HHS pretended that conscience objections were much ado about nothing, in both substance and consequence. It merely iterated that "the conscience provisions and Title X rules have existed side by side for decades with very little conflict, or even interaction." *Id.* That isn't good enough to survive APA review. *See Motor Vehicle Mfrs. Ass'n of U.S.,* 46 U.S. at 57 (agency "must supply a reasoned analysis"); *Cleveland Cliffs Iron Co. v. ICC*, 664 F.2d 568, 580 (6th Cir. 1981) (agency's reasoning must be "both discernible and defensible"). This is particularly true when the

concerns involve fundamental rights that animate religious and moral objections.

The Supreme Court has warned that failure to adequately consider religious exemptions when promulgating contraceptive rules would violate the APA. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 14*0 S. Ct. 2367, 2383–84 (2020). In *Little Sisters,* some states challenged HHS's express religious accommodation rules related to the contraception mandate in the Patient Protection and Affordable Care Act of 2010 (ACA). HHS promulgated two interim final rules (IFRs) following the Court's decisions in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (holding that the ACA's contraceptive mandate violated the Religious Freedom Restoration Act (RFRA)) and *Zubik v. Burwell*, 136 S. Ct. 1557, 1559 (2016) (remanding so that the parties could develop an approach that would accommodate employers' RFRA concerns). One IFR significantly expanded the church exemption to include an employer that "objects … based on its sincerely held religious beliefs," "to its establishing, maintaining, providing, offering, or arranging [for] coverage or payments for some or all contraceptive services." The other created a similar "moral exemption" for employers with sincerely held moral objections to

providing some or all forms of contraceptive coverage.  *Id.* at 2371 (quoting 82 Fed. Reg. 47812).

The Court upheld the rule, finding that the ACA provided a basis for both exemptions and the APA procedural requirements had been satisfied.  Although the Court did not need to reach the question, it felt *compelled* to address the plaintiffs' "argument that the [agencies] could not even consider RFRA as they formulated the religious exemption from the contraceptive mandate."  *Id.* at 2382–83.  The Court noted that "[i]t is hard to see how the [agencies] could promulgate rules consistent with [*Hobby Lobby* and *Zubik*] if they did not overtly consider these entities' rights under RFRA."  *Id.* at 2383.

Indeed, "[i]f the [agencies] did not look to RFRA's requirements or discuss RFRA at all when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem."  82 Fed. Reg. at 2384.  And that's just what happened here.  HHS paid lip service to the existence of these conscience statutes but failed to go to the trouble of noting them in the Final Rule. *See* 86 Fed. Reg. at 56153–56154.

Elsewhere in the context of exemptions, the Department of Homeland Security's (DHS) asylum eligibility rules were struck down as arbitrary and capricious for failing to address exemptions for unaccompanied minors. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021). The DHS asylum rule at issue did not exempt unaccompanied minors. *Id.* . Similar to HHS's Final Rule in this case, "[t]he agencies' only explanation for the Rule's failure to do so" was that minors were given special protection by other federal statutes and were still covered by the particular section of the INA. *See Id.* But merely referencing other statutory provisions without discussing special vulnerabilities falls below the modest threshold of reasoned decision making there and here. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021) ("This explanation in no way addresses the special vulnerability of unaccompanied minors and the failure of the Rule to take that vulnerability into account."); *see also Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 51 (agency was "too quick" to dismiss reasonable alternative).

The special vulnerabilities of current and potential conscientious Title X recipients and subrecipients, are well documented and obvious. *See* 86 Fed. Reg. at 56153; 84 Fed. Reg. at 7744, 7784; *Compliance With*

*Statutory Program Integrity Requirements*, 83 Fed. Reg. 25502, 25518 (June 1, 2018); *Vita Nuova*, 458 F. Supp. 3d at 550–51.  HHS failed to consider and failed to adequately address the significant burden the Final Rule would impose on religious and moral objectors.  That makes it arbitrary and capricious.

## CONCLUSION

The Final Rule deliberately engages in actions that support abortion as a family planning method.  It flouts § 1008's entire purpose by expressly committing the use of Title X funds to subsidize abortion.  It allows Title X grantees to have an abortion element in a program of family planning services.  But that policy option is simply one Congress has firmly echewed.  The statutory text and its interpretive case law make that clear.  To that same end, the Final Rule failed to consider and then— despite express statutory provisions protecting those who object to counseling and referrals for abortion—failed to expressly provide protections for the foreseeable objections its compulsions would beget.  Abortion is a morally fraught issue.  It has always aroused justifiable compunction. HHS should have explicitly made provision for that.  It did not.

For these reasons, Plaintiffs have easily carried their burden to show likelihood of success on the merits. *See Nken*, 556 U.S. at 434. The Court should grant Plaintiffs' Motion for Injunction Pending Appeal.

Respectfully submitted: January 12, 2021.

> AUSTIN KNUDSEN
> *Attorney General of Montana*
> KRISTIN HANSEN
> *Lieutenant General*
> DAVID M.S. DEWHIRST
> *Solicitor General*
>
> CHRISTIAN B. CORRIGAN
> *Assistant Solicitor General*
> Office of the Attorney General
> 215 North Sanders
> P.O. Box 201401
> Helena, MT 59620-1401
> david.dewhirst@mt.gov
> christian.corrigan@mt.gov
>
> */s/ Christian Corrigan*
> CHRISTIAN CORRIGAN
>
> *Attorneys for Amicus Curiae*

**Additional Counsel for Amici Curiae:**

Treg R. Taylor
ALASKA ATTORNEY GENERAL

Chris Carr
GEORGIA ATTORNEY GENERAL

Lawrence G. Wasden
IDAHO ATTORNEY GENERAL

Theodore E. Rokita
INDIANA ATTORNEY GENERAL

Jeff Landry
LOUISIANA ATTORNEY GENERAL

Lynn Fitch
MISSISSIPPI ATTORNEY GENERAL

Jason Ravnsborg
SOUTH DAKOTA ATTORNEY GENERAL

Ken Paxton
TEXAS ATTORNEY GENERAL

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 4,923 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/    *Christian Corrigan*
CHRISTIAN CORRIGAN

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system

/s/    *Christian Corrigan*
CHRISTIAN CORRIGAN