UNITED STATES COURT OF APPEALS
SIXTH CIRCUIT

STATE OF OHIO, et al.,

                    *Plaintiffs-Appellants,*               No. 21-4235

                    v.

XAVIER BECERRA, et al.,

                    *Defendants-Appellees.*



**BRIEF FOR THE STATES OF CALIFORNIA, NEW YORK, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF APPELLEES AND IN OPPOSITION TO APPELLANTS' MOTION FOR AN INJUNCTION PENDING APPEAL**

ROB BONTA
 *Attorney General*
 *State of California*
1300 I Street
Sacramento, CA 95814
(916) 210-6276

LETITIA JAMES
 *Attorney General*
 *State of New York*
The Capitol
Albany, NY 12224
(518) 776-2028

*(Counsel listing continues on signature pages.)*     Dated: January 14, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................ii

INTERESTS OF AMICI ........................................................................ 1

ARGUMENT ...................................................................................... 4

POINT I

AN INJUNCTION PENDING APPEAL IS AN EXTRAORDINARY REMEDY THAT, IF GRANTED AT ALL, MUST ACCOUNT FOR SIGNIFICANT RELIANCE INTERESTS ............................................................................ 4

POINT II

AMICI STATES' EXPERIENCE UNDER THE 2019 RULE CONFIRMS THAT EVEN A TEMPORARY INJUNCTION WOULD SEVERELY HARM PATIENTS, PROVIDERS, AND AMICI STATES ............................................. 7

    A.    The 2019 Rule Caused a Staggering Loss of Title X Providers and Corresponding Reduction in Delivery of Care to Title X Patients. ........................................................... 9

    B.    The 2019 Rule Harmed Amici States' Budgets and Capacity to Promote Public Health. ...................................... 13

CONCLUSION ...................................................................................... 15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ............................................................ 6

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................................... 6

*California ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) .......................................................... 3

*Central & S.W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ............................................................ 6

*Encino Motorcars LLC v. Navarro*,
579 U.S. 211 (2016) .......................................................................... 8

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) .......................................................................... 5

*Mayor & City Council of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ............................................................ 3

*NAACP v. Trump*,
298 F. Supp. 3d 209 (D.D.C. 2018) ................................................... 6

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 5

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) ............................................................................ 6

*Ohio Citizens for Responsible Energy, Inc. v. NRC*,
479 U.S. 1312 (1986) ........................................................................ 5

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................. 4

**Regulations** **Page(s)**

Compliance with Statutory Program Integrity
  Requirements, 84 Fed. Reg. 7,714 (Mar. 4, 2019)............................ 2, 7

Ensuring Access to Equitable, Affordable, Client-Centered,
  Quality Family Planning Services, 86 Fed. Reg. 19,812
  (Apr. 15, 2021).................................................................................... 2

Ensuring Access to Equitable, Affordable, Client-Centered,
  Quality Family Planning Services, 86 Fed. Reg. 56,144
  (Oct. 7, 2021) .............................................................................. passim

**Miscellaneous Authorities**

American Coll. of Obstetricians & Gynecologists, Comm. on
  Health Care for Underserved Women, Comm. Op. No. 586
  (2014), https://www.acog.org/-
  /media/project/acog/acogorg/clinical/files/committee-
  opinion/articles/2014/02/health-disparities-in-rural-women.pdf....... 13

American Med. Ass'n, Code of Medical Ethics Op. E-2.1.1 (2017),
  https://www.ama-assn.org/delivering-care/ethics/informed-
  consent ............................................................................................... 7

American Med. Ass'n, Code of Medical Ethics Op. E-2.1.3 (2017),
  https://www.ama-assn.org/delivering-care/ethics/withholding-
  information-patients.......................................................................... 8

Brittni Frederiksen et al., *Data Note: Impact of New Title X
  Regulations on Network Participation*, Kaiser Fam. Found.
  (Sept. 20, 2019), https://www.kff.org/womens-health-
  policy/issue-brief/data-note-impact-of-new-title-x-regulations-
  on-network-participation/ .................................................................. 9

**Miscellaneous Authorities**                                                    **Page(s)**

Brittni Frederiksen et al., *Data Note: Is the Supplemental Title X
    Funding Awarded by HHS Filling in the Gaps in the
    Program?*, Kaiser Fam. Found. (Oct. 18, 2019),
    https://www.kff.org/womens-health-policy/issue-brief/data-
    note-is-the-supplemental-title-x-funding-awarded-by-hhs-
    filling-in-the-gaps-in-the-program/ .................................................... 13

Brittni Frederiksen et al., *Key Elements of the Biden
    Administration's Proposed Title X Regulation*, Kaiser Family
    Found. (May 5, 2021), https://www.kff.org/womens-health-
    policy/issue-brief/key-elements-of-the-biden-administrations-
    proposed-title-x-regulation/ ................................................................ 10

Brittni Frederiksen et al., *Rebuilding Title X: New Regulations
    for the Federal Family Planning Program*, Kaiser Fam.
    Found. (Nov. 3, 2021), https://www.kff.org/womens-health-
    policy/issue-brief/rebuilding-title-x-new-regulations-for-the-
    federal-family-planning-program/ ...................................................... 10

Christina Fowler et al., *Title X Family Planning Annual Report:
    2018 National Summary* (Off. of Population Affs. 2019),
    https://opa.hhs.gov/sites/default/files/2020-07/title-x-fpar-
    2018-national-summary.pdf .......................................................... 9, 10

Christina Fowler et al., *Title X Family Planning Annual Report:
    2020 National Summary* (Off. of Population Affs. 2021),
    https://opa.hhs.gov/sites/default/files/2021-09/title-x-fpar-
    2020-national-summary-sep-2021.pdf ........................................... 9, 10

Comment Letter from Att'ys Gen. (May 17, 2021),
    https://ag.ny.gov/sites/default/files/letter_from_23_state_attorneys_
    general_in_support_of_proposed_title_x_rule_may_17_2021.pdf...3, 8, 14

iv

**Miscellaneous Authorities** Page(s)

Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contra_ceptive Services at Title X–Funded Facilities in 2016*, 50 Persps. on Sexual & Reprod. Health 101 (2018), https://onlinelibrary.wiley.com/doi/epdf/10.1363/psrh.12061.............. 11

Office of the Assistant Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs., *2019 Poverty Guidelines* (n.d.), https://aspe.hhs.gov/2019-poverty-guidelines.......................... 12

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291 (2003), https://scholarship.law.duke.edu/dlj/vol53/iss2/1/ ................... 5

# INTERESTS OF AMICI

The United States District Court for the Southern District of Ohio (Black, J.) denied appellants' motion for a preliminary injunction against the implementation of a 2021 federal rule regulating the operation of the Title X program ("2021 Rule"),[1] and appellants have now asked this Court for such an injunction pending appeal. Amici—the States of California, New York, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin, and the District of Columbia—submit this brief opposing appellants' motion. Amici States have a strong interest in the application of the 2021 Rule, which reinstates medical and operational standards that had governed the Title X program for decades, until those standards were abruptly changed in 2019. By reverting to the pre-2019 standards, the 2021 Rule restores access to a wide range of healthcare services for amici's residents, especially those in low-income, rural, and other underserved communities.

---

[1] Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56,144 (Oct. 7, 2021).

For nearly fifty years, the Title X program has been the linchpin of publicly funded family planning, serving nearly 200 million low-income or uninsured individuals and others. *See* Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 19,812, 19,817 (Apr. 15, 2021) (proposed rule). Title X "clinics have played a critical role in ensuring access to a broad range of family planning and related preventive health services," *id.*, including screenings for high blood pressure, anemia, diabetes, sexually transmitted diseases, and cervical and breast cancer.

In 2019, the Department of Health and Human Services (HHS) issued a new rule that departed from nearly three decades of federal policy by barring Title X providers from communicating certain abortion-related medical information to patients and requiring physical separation of facilities providing Title X–funded care from facilities providing abortion-related services. Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,715 (Mar. 4, 2019) ("2019 Rule"); *see id.* at 7,721. These restrictions reduced the quality of care available to patients and proved cost-prohibitive for many providers that had

structured their operations on HHS's longstanding view that Title X requires financial, but not physical, separation.

As a result, staggering numbers of providers in amici States exited the Title X program. The loss of funding compelled many providers to curtail services, charge higher fees, or close down altogether, which in turn deprived patients of access to a wide range of critical healthcare services. Many amici States sued to stop the 2019 Rule and submitted a comment letter supporting the 2021 Rule.[2]

Appellants' requested injunction would reimpose the 2019 Rule, thereby reinstating its attendant harms. Amici's experience confirms the district court's finding that the overwhelming benefits of the 2021 Rule for providers, patients, and public health far outweigh any harms alleged by appellants. Even if this Court were to disagree, any relief would need to account for the significant reliance interests of providers, patients, and amici States in the longstanding standards governing the Title X

---

[2] *See California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1074 (9th Cir. 2020) (en banc); *Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258, 266 (4th Cir. 2020) (en banc); Comment Letter from Att'ys Gen. (May 17, 2021) (internet). (For authorities available on the internet, full URLs appear in the Table of Authorities. All URLs were last visited on January 14, 2022.)

program, which the 2021 Rule reinstated. In just two years while the 2019 Rule was in effect, it upended those reliance interests with devastating results—obstructing delivery of a broad range of critical healthcare, forcing patients to forgo such care, and impairing amici's ability to protect public health. A temporary injunction would reinflict the severe harms caused by the 2019 Rule.

## ARGUMENT

### POINT I

#### AN INJUNCTION PENDING APPEAL IS AN EXTRAORDINARY REMEDY THAT, IF GRANTED AT ALL, MUST ACCOUNT FOR SIGNIFICANT RELIANCE INTERESTS

Like all forms of preliminary injunctive relief, an injunction pending appeal is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movants must make a clear showing that they are "likely to succeed on the merits," they are "likely to suffer irreparable harm" absent injunctive relief, "the balance of equities tips in" their favor, and "an injunction is in the public interest." *Id.* at 20.

Unlike a stay pending appeal that "simply suspend[s] judicial alteration of the status quo," an injunction pending appeal "grants

judicial intervention" withheld by the lower court. *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers); *accord Nken v. Holder*, 556 U.S. 418, 429 (2009) (quoting *Ohio Citizens*). Injunctive relief therefore "demands a significantly higher justification" than a stay and should not be granted except "in the most critical and exigent circumstances." *Ohio Citizens*, 479 U.S. at 1313-14 (Scalia, J., in chambers) (quotation marks omitted).

Even if warranted, any injunctive relief should be appropriately tailored to account for significant reliance interests. Consistent with traditions of equity, which are distinguished by their "[f]lexibility rather than rigidity," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944), courts have been especially careful to devise remedies that minimize harm to long-established programs or policies with substantial nationwide impact.[3] For example, courts have remanded a matter to an agency without vacating the agency's underlying action, even if the action violated the Administrative Procedure Act, where vacatur would be "disruptive" and

---

[3] Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 323 (2003) (internet).

there is "at least a serious possibility" the agency could support its decision on remand. *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (quotation marks omitted); *see id.* at 702.[4] Courts have also vacated agency action but stayed the vacatur order for a "limited time to allow the agency to attempt to cure the defects that the court has identified." *NAACP v. Trump*, 298 F. Supp. 3d 209, 244 (D.D.C. 2018); *see id.* at 245; *cf., e.g., Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 54, 87 (1982) (plurality op.) (temporarily staying judgment to allow Congress to address constitutional deficiency); *Buckley v. Valeo*, 424 U.S. 1, 143 (1976) (per curiam) (same).

Accordingly, if the Court were to conclude that interim relief is warranted (and amici maintain that it is not), the Court would need to consider these or other limiting approaches to properly account for the important reliance interests here.

---

[4] *See also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290-92 (11th Cir. 2015) (collecting cases).

## POINT II

**AMICI STATES' EXPERIENCE UNDER THE 2019 RULE CONFIRMS THAT EVEN A TEMPORARY INJUNCTION WOULD SEVERELY HARM PATIENTS, PROVIDERS, AND AMICI STATES**

The 2019 Rule reversed three decades of Title X policy. The Rule disqualified family planning clinics with co-located abortion services, which upended the expectations of providers that had structured their operations in reliance on HHS's longstanding view that Title X requires only financial, and not physical, separation. The 2019 Rule also restricted providers' ability to give patients relevant and desired medical information, contrary to well-established standards of care. For example, patients seeking medical advice could not obtain a referral for abortion services, even upon request. And patients seeking abortion counseling were forced to receive counseling about carrying their pregnancy to term regardless of their wishes. 84 Fed. Reg. at 7,747. These practices run counter to established professional medical standards, which instruct clinicians to "[p]resent relevant information accurately and sensitively, in keeping with the patient's preferences,"[5] and not to "withhold[]

---

[5] American Med. Ass'n, Code of Medical Ethics Op. E-2.1.1 (2017) (internet).

information without the patient's knowledge or consent," which "is ethically unacceptable."[6]

These policy changes inflicted devastating harm. As amici's experience demonstrates, the 2019 Rule forced providers to leave the Title X program, curtail services, or even close down, and new providers did not materialize to fill the deficit.[7] *See* 86 Fed. Reg. at 56,174. The 2019 Rule therefore obstructed patients' access to a broad range of critical healthcare services and significantly strained state resources as many amici reallocated funds to mitigate the loss of federal funding. Granting appellants' request to enjoin implementation of the 2021 Rule and reinstate the 2019 Rule, even temporarily, would continue and exacerbate these harms.[8]

---

[6] American Med. Ass'n, Code of Medical Ethics Op. E-2.1.3 (2017) (internet).

[7] Comment Letter from Att'ys Gen., *supra*, at 3.

[8] In contrast to amici's "serious reliance interests" engendered by HHS's "longstanding polic[y]" before 2019, *see Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 222 (2016), appellants submitted evidence only that Ohio—one of twelve appellants—had purportedly developed reliance interests based on the short-lived 2019 Rule. *See* Mot. for Injunction Pending Appeal at 17-18.

**A. The 2019 Rule Caused a Staggering Loss of Title X Providers and Corresponding Reduction in Delivery of Care to Title X Patients.**

The abrupt policy reversal in 2019 decimated the Title X program. Before the 2019 Rule, HHS funded 90 grantees supporting approximately 4,000 Title X clinics nationwide.[9] But between 2018 and 2020, the number of grantees, subrecipients, and service sites dropped by nearly 25%. The Title X program lost 24 out of 99 grantees; 261 out of 1,128 subrecipients; and 923 out of 3,954 service sites.[10] Six States—Hawaiʻi, Maine, Oregon, Utah, Vermont, and Washington—lost *all* Title X providers. In eight others—Alaska, Connecticut, Illinois, Maryland, Massachusetts, Minnesota, New Hampshire, and New York—grantees

---

[9] Brittni Frederiksen et al., *Data Note: Impact of New Title X Regulations on Network Participation*, Kaiser Fam. Found. (Sept. 20, 2019) (internet).

[10] *Compare* Christina Fowler et al., *Title X Family Planning Annual Report: 2020 National Summary* 9 (Off. of Population Affs. 2021) (internet), *with* Christina Fowler et al., *Title X Family Planning Annual Report: 2018 National Summary* 7 (Off. of Population Affs. 2019) (internet).

representing more than half of the Title X clinics in each State left the Title X program.[11]

Because of mass provider withdrawals, the number of patients receiving Title X services fell drastically between 2018 and 2020.[12] Nationwide, the number of Title X patients fell more than 60%, from 3.9 million to 1.5 million.[13] The decrease in individual States was often higher: 81% in California, 83% in Wisconsin, and 77% in Michigan. Many appellant States also experienced significant drops in Title X patients; for example, Ohio, Arizona, South Carolina, and Kentucky each saw 40-65% fewer Title X patients.[14]

---

[11] Brittni Frederiksen et al., *Key Elements of the Biden Administration's Proposed Title X Regulation*, Kaiser Family Found. (May 5, 2021) (internet).

[12] Contrary to appellants' assertions below, the drop in Title X patients between 2018 and 2020 resulted primarily from the 2019 Rule, not the COVID-19 pandemic. *See* 86 Fed. Reg. at 56,151-52.

[13] Brittni Frederiksen et al., *Rebuilding Title X: New Regulations for the Federal Family Planning Program*, Kaiser Fam. Found. (Nov. 3, 2021) (internet).

[14] *Compare* Fowler et al., *2020 National Summary*, *supra*, app. B at B-4 to -5, *with* Fowler et al., *2018 National Summary*, *supra*, app. B at B-4 to -5.

The 2019 Rule has also harmed the delivery and quality of healthcare services, with serious consequences for public health. A 2016 survey showed that Title X clinics were the only source of comprehensive medical care for 60% of their patients.[15] After the 2019 Rule, many patients could not access any Title X provider, incurred more out-of-pocket costs, or experienced a disruption in the continuity of their care. Patients who obtained care from a provider that withdrew from the Title X program were often subject to increased fees due to the provider's need to compensate for the loss of Title X funding. 86 Fed. Reg. at 56,151.

Accordingly, organizations saw patients forgoing recommended tests, lab work, sexually transmitted infection (STI) testing, clinical breast exams, and Pap tests in large numbers. *Id.* Between 2018 and 2019, Title X clinics performed 90,386 fewer Pap tests to screen for cervical cancer; 188,920 fewer breast exams; 276,109 fewer human immunodeficiency virus tests; and over one million fewer STI tests. *Id.* at 56,147; *see id.* at 56,173. In the same timeframe, 225,688 fewer Title

---

[15] Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X–Funded Facilities in 2016*, 50 Persps. on Sexual & Reprod. Health 101, 105 (2018) (internet).

X patients received oral contraceptives; 49,803 fewer patients received hormonal implants; and 86,008 fewer patients received intrauterine devices. *Id.* at 56,147.

In particular, the 2019 Rule severely harmed low-income, minority, and rural communities that typically benefit from the Title X program. After the 2019 Rule, Title X providers saw 573,650 fewer patients under the federal poverty level, *id.* at 56,146—in 2019, an annual income of $25,750 for a family of four.[16] And Title X providers saw 324,776 fewer uninsured patients in 2019 as compared to 2018. 86 Fed. Reg. at 56,147. Similarly, of patients receiving Title X services in 2019 as compared to 2018, there were 269,569 fewer Hispanics or Latinos; 128,882 fewer Black or African Americans; 50,039 fewer Asians; and 13,942 fewer American Indians, Alaska Natives, Native Hawai'ians, or Pacific Islanders. *Id.* In rural areas, where Title X clinics are critical due to

---

[16] *See* Office of the Assistant Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs., *2019 Poverty Guidelines* (n.d.) (internet).

provider shortages and lack of transportation,[17] patients also lost Title X care. For example, Connecticut lost all Title X providers in rural areas.[18]

## B.     The 2019 Rule Harmed Amici States' Budgets and Capacity to Promote Public Health.

Amici's experience under the 2019 Rule confirms that granting appellants' requested injunction would significantly strain States' budgets and their capacity to promote public health. In the past two years, many amici have been forced to expend millions in funds to keep clinics open and ensure access to necessary healthcare. For instance, New York made emergency appropriations of $14.2 million to cover the loss of Title X funds in 2021, and California provided $348,488 in one-time grants. Other amici have allocated substantial funds for one- to two-year periods: $400,000 in Colorado; $750,000 in Hawai'i; $3.7 million in Illinois; $8 million in Massachusetts; $1.6 million in Michigan; $9.5 to $19.5 million per year in New Jersey; $3 million per year in Oregon; $1.6 million per

---

[17] *See* American Coll. of Obstetricians & Gynecologists, Comm. on Health Care for Underserved Women, Comm. Op. No. 586, at 1 (2014) (internet).

[18] Brittni Frederiksen et al., *Data Note: Is the Supplemental Title X Funding Awarded by HHS Filling in the Gaps in the Program?*, Kaiser Fam. Found. (Oct. 18, 2019) (internet).

year in Vermont;[19] $2.1 million in Connecticut; and $8.4 million in Washington.

Many of these supplemental funds are one-time grants or rely on other finite sources of support that have been or will be exhausted. And the need to replace Title X funds means fewer resources available for other public health purposes. The temporary infusion of millions of dollars in state healthcare spending, particularly during the time of exceptional public need caused by COVID-19, has strained state budgets and left family planning programs uncertain of their ability to continue providing care. An injunction halting implementation of the 2021 Rule would further impair amici's capacity to deliver critical healthcare to their residents, in contravention of amici's long and substantial reliance on Title X funding.

---

[19] *See* Comment Letter from Att'ys Gen., *supra*, at 7-9.

# CONCLUSION

For the reasons set forth above and in appellees' opposition, this Court should deny appellants' motion for an injunction pending appeal.

Dated: Albany, New York
January 14, 2022

Respectfully submitted,

ROB BONTA
*Attorney General*
*State of California*
RENU R. GEORGE
*Senior Assistant Attorney General*
KARLI EISENBERG
KATHLEEN BOERGERS
*Supervising Deputy Attorneys General*
KETAKEE KANE
ANNA RICH
*Deputy Attorneys General*

California Department of Justice
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
(510) 879-1519
ketakee.kane@doj.ca.gov

LETITIA JAMES
*Attorney General*
*State of New York*
BARBARA D. UNDERWOOD
*Solicitor General*
ANISHA S. DASGUPTA
*Deputy Solicitor General*
BLAIR J. GREENWALD
*Assistant Solicitor General*

By:  */s/ Laura Etlinger*
LAURA ETLINGER
*Assistant Solicitor General*

The Capitol
Albany, NY 12224
(518) 776-2028
laura.etlinger@ag.ny.gov

*(Counsel listing continues on the next three pages.)*

15

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

HOLLY T. SHIKADA
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, Illinois 60601

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 St. Paul Place
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King
Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
Department of Justice
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

ANDREW J. BRUCK
  *Acting Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, New Jersey 08625

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
17 West Main Street
Madison, WI 53703

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 2,599 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and the corresponding local rules.

 /s/ Kelly Cheung

# CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2022, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: Albany, NY
       January 14, 2022

                      */s/ Laura Etlinger*
                      LAURA ETLINGER